694 P.2d 328

**V.G.I. HARVESTING COMPANY, an Arizona corporation, Plaintiff-Appellant,**

v.

**ARIZONA AGRICULTURAL EMPLOYMENT RELATIONS BOARD, an agency of the State of Arizona, Defendant-Appellee,**

**and**

**UNITED FARM WORKERS OF AMERICA, AFL–CIO, a labor organization, Real Party in Interest/Appellee.**

**No. 1 CA–CIV 6541.**

Court of Appeals of Arizona, Division 1, Department C.

Jan. 15, 1985.

Westover, Choules, Shadle, Bowen & Clark, P.C. by Stephen P. Shadle, Allen J. Clark, Yuma, for plaintiff-appellant.

William Gibney, General Counsel and Loretta Jacobs-Schwartz, Gen. Counsel, Phoenix, for defendant-appellee Arizona Agricultural Employment Relations Board.

Treon, Warnicke & Roush, P.A. by Stanley Lubin, Phoenix, and Lyons, Alcala, Chavez, Eggers & Garcia by Ellen J. Eggers, Keene, Cal., for real party in interest, United Farm Workers of America, AFL–CIO.

## OPINION

OGG, Judge.

This is a review of a judgment of the Yuma County Superior Court affirming an order of the Arizona Agricultural Employment Relations Board (Board) which directed that an election be held to determine whether the United Farm Workers of America (U.F.W.) would be the collective bargaining representative of the employees of V.G.I. Harvesting Company (V.G.I.). Specifically, V.G.I. appeals from the Board's finding that a "question of representation" existed, warranting an election.

We begin by reviewing, as best we can, the facts giving rise to this appeal. On January 31, 1980, U.F.W. filed a petition for election, alleging that thirty percent or more of V.G.I.'s agricultural employees wished to be represented for purposes of collective bargaining by U.F.W. *See* A.R.S. § 23–1389(C)(1). This petition was dismissed on motion of V.G.I. on February 14, 1980.

An amended petition was filed by U.F.W. on February 15, 1980, once again alleging a thirty percent interest in U.F.W. representation. U.F.W. also alleged in its petition that there were 450 agricultural employees in the bargaining unit. *See* A.R.S. §§ 23–1389(B) and 23–1382(1). A hearing was held on the petition on February 27 and 28, 1980. *See* A.R.S. § 23–1389(C). At the hearing, the Board's hearing officer, *see* A.R.S. § 23–1388(A), excluded various employees from the bargaining unit, resulting in a total bargaining unit of 380 employees. U.F.W. presented union authorization cards purportedly signed by employees of V.G.I. to establish proof of interest. The hearing officer determined that U.F.W. had obtained and submitted 117 authorization cards signed by members of the bargaining unit. However, based upon the investigation and testimony of Board investigator Paul Acuna, the hearing officer concluded that ten percent of the authorization cards had signature discrepancies, leaving only 106 valid authorization cards. This resulted in a showing of interest of only twenty-eight percent. U.F.W. objected to the hearing officer not including in the bargaining unit V.G.I. employees employed on February 15, 1980, but not employed in the prior calendar year, 1979. The hearing officer reserved ruling on U.F.W.'s contention, providing counsel five days to present written briefs on the issue of the appropriate bargaining unit.

Prior to the next hearing, the hearing officer recomputed the size of the bargaining unit, expanding it to 430 employees. The expansion was due to the hearing officer's inclusion of employees who worked for V.G.I. in 1980, but had not worked for V.G.I. in the calendar year 1979. As a result of the bargaining unit expansion, additional authorization cards were counted, resulting in the requisite thirty percent showing of interest.

V.G.I. filed a motion for reconsideration, asserting that the hearing officer erred by including in the bargaining unit V.G.I. em-

ployees who did work for V.G.I. in 1980 but not in 1979. A second hearing was held on March 18, 1980, at which time V.G.I.'s motion for reconsideration was denied. Based upon the hearing officer's determination of the appropriate bargaining unit, V.G.I. argued that an additional 93 employees should be added to the total. The hearing officer subsequently added the 93 employees to the bargaining unit.

By order dated March 24, 1980, the hearing officer concluded that the bargaining unit totaled 523 temporary and permanent employees. The hearing officer found that U.F.W. had "reasonably exhibited authorization cards in excess of the thirty percent requirement of the statute."

An election was held on March 28, 1980, resulting in 169 votes in favor of U.F.W. representation and 40 votes for "no union". The Board subsequently affirmed the hearing officer's order directing the election by a vote of 3–2. V.G.I. then filed a complaint for judicial review of the Board's order. The Yuma County Superior Court affirmed the Board's order. This appeal followed.

■ The first issue we must address is the Board's assertion that the hearing officer's determination that an issue of representation existed is not judicially reviewable. The Board relies upon the National Labor Relations Act[1] to support its assertion. Under the federal act, orders of the National Labor Relations Board on the issue of representation are not subject to direct judicial review:

> Generally, NLRB decisions in representation cases are not directly reviewable by the federal courts. Congress has provided in section 10(f) [29 U.S.C. § 160(f)] of the National Labor Relations Act (the Act) that only a "final order" of the Board is subject to review by a court of appeals, and the United States Supreme Court has determined that a Board order in a certification proceeding is not such an order. *American Federation of Labor v. N.L.R.B.* [308 U.S. 401,

60 S.Ct. 300, 84 L.Ed. 347 (1940) ]. Consequently, orders concerning representation matters are reviewable only as they are drawn into question by a petition for enforcement or review of a Board order made under section 10(c) [29 U.S.C. § 160(c) ] of the Act to restrain an unfair labor practice. (citations omitted) (footnotes omitted)

*Bishop v. National Labor Relations Board*, 502 F.2d 1024, 1027 (5th Cir.1974).

■ Conversely, the Agricultural Employment Relations Act of Arizona[2] specifically provides that an agricultural employer may challenge a petition alleging a thirty percent showing of interest:

> Within five days of receipt of such a petition, the agricultural employer *may file a challenge to such petition* on the ground that the authorization for the filing of such petition is not current or that such authorization has been obtained by fraud, misrepresentation or coercion. Such petition shall not act to stay the election proceeding but *if it is thereafter determined* that the authorizations are not current or obtained by fraud, misrepresentation or coercion the petition will be dismissed. (emphasis added)

A.R.S. § 23–1389(F). Clearly the statute provides that a challenge to U.F.W.'s petition will not stay the election once the hearing officer has determined that a question of representation exists warranting an election, *see* A.R.S. § 23–1389(C) and (D); however, it also provides that if *thereafter* it is determined that the petition is defective, the petition *will* be dismissed.

■ Nevertheless, the statute does not specify that the hearing officer's determination is subject to *judicial* review. However, the Arizona Administrative Review Act[3] provides that a "final decision" of an administrative agency is subject to judicial review. *See* A.R.S. § 12–902(A). The exceptions to judicial review are public welfare decisions pursuant to title 46, or where

---

**1.** 29 U.S.C. §§ 151–158, 159–168.

**2.** A.R.S. § 23–1381 *et seq.*

**3.** A.R.S. § 12–901 *et seq.*

the act conferring power on the agency, or a separate act, provides for judicial review of the agency decisions *and* prescribes a definite procedure for review. A.R.S. § 12–902(A). A.R.S. § 12–901(2) provides in pertinent part:

"Administrative decision" or "decision" means any decision, order or determination of an administrative agency rendered in a case which *affects the legal rights,* duties or privileges of persons and which *terminates the proceeding before the administrative agency.* In all cases in which a statute or a rule of the administrative agency requires or permits an application for a rehearing or other method of administrative review, and an application for a rehearing or review is made, no administrative decision of such agency is *final* as to the party applying therefor until the rehearing or review is denied, or the decision on rehearing or review is rendered.... (emphasis added)

We hold that the Arizona Administrative Review Act applies to decisions of the Board and that V.G.I. has fully complied with the statutory requirements for judicial review of the hearing officer's determination as well as the Board's affirmance of that determination.

■ The Board further argues that even if the hearing officer's finding of a sufficient showing of interest is reviewable, the issue is moot since the results of the election conclusively establish a thirty percent showing of interest. We must reject this assertion. First, we find it untenable to provide for both administrative and judicial review of the hearing officer's decision ordering the election and then provide no remedy should the employer be successful in that review.[4] Secondly, we cannot say for certain that the hearing officer's determination that valid authorization cards were submitted to warrant an election did not influence other employees to vote in favor of union representation. As pointed out by V.G.I.:

Whatever his true intentions, an employee who signs a[n] [authorization card] prior to an election is indicating to other workers that he supports the union. His outward manifestation of support must often serve as a useful campaign tool in the union's hands to convince other employees to vote for the union, if only because many employees respect their coworkers' views on the unionization issue.

*National Labor Relations Board v. Savair Manufacturing Co.,* 414 U.S. 270, 277, 94 S.Ct. 495, 499, 38 L.Ed.2d 495, 502 (1973). This is particularly persuasive in the present case in which the number of valid authorization cards submitted by U.F.W. was very close to the thirty percent showing of interest standard. We conclude that U.F.W.'s overwhelming victory in the election does not render the underlying finding of an issue of representation moot.

■ The scope of review at the trial court level is limited to whether the Board's finding of an issue of representation was illegal, arbitrary, capricious, or resulted from an abuse of discretion. *Schade v. Arizona State Retirement System,* 109 Ariz. 396, 510 P.2d 42 (1973); *Eshelman v. Blubaum,* 114 Ariz. 376, 560 P.2d 1283 (App.1977). Our review of the trial court's judgment affirming the Board's decision is limited to whether the record contains evidence of a substantial nature to support the trial court's decision. *Schade v. Arizona State Retirement System, supra.* However, the scope of review is different when the issue is an interpretation of law by the Board. In interpreting a statute the trial court and the appellate court are free to draw their own legal conclusions and determine whether the agency erred in its interpretation of the statute. *See Eshelman v. Blubaum, supra.*

A.R.S. § 23–1389 provides in pertinent part:

C. The board shall investigate any petition, and if it has reasonable cause to believe that a question of representation

---

**4.** *See* A.R.S. §§ 23–1389(F) and 12–902(A).

exists shall provide for an appropriate hearing upon due notice, when such petition has been filed in good faith in accordance with such regulations as may be prescribed by the board:

1. By an agricultural employee or group of agricultural employees or any individual or labor organization acting in their behalf *alleging* that *thirty per cent* or more of the number of agricultural employees in the unit in question either wish to be represented for collective bargaining and that their employer declines to recognize their representative ...

\* \* \* \* \* \*

D. If the board finds upon the record of such hearing that a *question of representation* exists, it shall direct an election by secret ballot and shall certify the results thereof.... (emphasis added)

Apparently the hearing officer determined that the bargaining unit would consist of both temporary and permanent agricultural employees. *See* A.R.S. § 23–1389(B). Both classifications of employees are statutorily defined in A.R.S. § 23–1382(1), which provides in pertinent part:

"Agricultural employee, permanent" means *any employee* over sixteen years of age *who has been employed* by a particular agricultural employer for at least six months during the *preceding calendar year,* engaged in the growing or harvesting of agricultural crops or the packing of agricultural crops where packing is accomplished in the field. "Agricultural employee, temporary" means *any employee* over sixteen years of age *who is employed* by a particular agricultural employer and *who has been so employed during the preceding calendar year,* engaged in the growing or harvesting of agricultural crops or the packing of agricultural crops where packing is accomplished in the field.... (emphasis added)

■ Although the hearing officer initially followed the statutory definition of agricultural employees in determining the size of the bargaining unit, he subsequently recalculated the size of the bargaining unit, including employees who had not worked for V.G.I. at all during the prior calendar year:

... It's my feeling that although in my earlier ruling during the hearing that we would not include employees that worked only in 1980 and didn't work in 1979, the common sense approach is those employees should be included that worked prior to the filing of the petition within one year. I just see many loopholes interpreting it any other way, although I look at those words "preceding calendar year" and they definitely cause me some concern. But, at this stage, I have to rule in what I feel is a common sense approach and that's my feeling. And of course that is subject to be overturned on appeal or whatever.

Unfortunately, the hearing officer chose to follow his "common sense"[5] rather than the clear wording of the statute and thus erred in determining the appropriate bargaining unit as a matter of law. Unquestionably, "preceding calendar year" means exactly what it says, that is, January 1st through December 31st of the preceding year (1979). By interpreting "calendar year" to mean the twelve months prior to U.F.W.'s petition for election, the hearing officer erroneously included in the bargaining unit many newly hired employees who were statutorily excluded from the unit.

■ U.F.W. and the Board argue that even if the hearing officer erred in determining the appropriate bargaining unit, his finding of an issue of representation may nevertheless be affirmed.

Specifically, U.F.W. asserts that an actual finding of interest of thirty percent by the hearing officer was not required.

---

**5.** We somewhat sympathize with this "common sense" approach. Assuming that the petition was filed in December, theoretically many employees who had worked for the past eleven months would be ineligible to express authorization and subsequently vote if an election were held. Moreover, given the transient labor force involved, it is quite likely that few employees would exist who had been working in December of the previous year.

U.F.W. points out that A.R.S. § 23–1389 requires only that the union *allege* that thirty percent or more of the eligible agricultural employees desire U.F.W. representation. At that point, the Board must investigate the petition and, if it has reasonable cause to believe that a question of representation exists, it must order a hearing. *See* A.R.S. § 23–1389(C). "If the board finds upon the record of such hearing *that a question of representation* exists, it shall direct an election...." (emphasis added). A.R.S. § 23–1389(D). At the time of the hearing, there existed no statute or board regulation defining "question of representation".[6] Thus, U.F.W. asserts that submission of authorization cards was not required and the hearing officer's finding of an issue of representation should be upheld even if the record does not reflect a thirty percent showing of interest. However, it is clear from the record that, whether or not the hearing officer was *required* to find a thirty percent showing of interest prior to finding that a question of representation existed, he nonetheless subjectively required a thirty percent showing prior to concluding that a question of representation existed. This is evidenced in the hearing officer's decision upon V.G.I.'s supplemental motion for rehearing wherein he writes:

IT IS FURTHER FOUND that petitioner has reasonably exhibited authorization cards in excess of the thirty percent *requirement* of the statute thereby showing that a questions [sic] of representation exists based on a review of all the evidence presented in the documents referred to and the investigator's investigation. (emphasis added)

6. Subsequent to the Board's decision in this case, the Board adopted pre-election procedures which provide a means of establishing a "question of representation". However, we do not consider the procedures in this case.

7. It is clear that Acuna utilized the proper bargaining unit of 380 employees in conducting his initial investigation of the authorization cards. This is evidenced by his responses to U.F.W. counsel's inquiries:

Additionally, in the hearing officer's response to the Board's inquiries, it is clear that the hearing officer required a thirty percent showing of interest prior to finding that a question of representation existed:

This hearing officer's decision of March 14, 1980 was based on a *need of 30%* of 430 employees in the unit or 129 signatures ... (emphasis added)

Moreover, it is clear from the record that throughout the hearings *all* parties proceeded on the assumption that a thirty percent showing of interest was a necessary prerequisite to the hearing officer finding a question of representation. Thus, it is clear that the hearing officer would not have found that a question of representation existed, warranting an election, but for his conclusion that thirty percent of the agricultural employees in the bargaining unit had showed an interest by way of union authorization cards in U.F.W. representation. As previously noted, the hearing officer's determination of the bargaining unit was in error.

■■■ U.F.W. and the Board also argue that a thirty percent showing of interest was made based upon the hearing officer's initial and correct determination of the bargaining unit. We disagree.

Initially the correct bargaining unit was considered by the hearing officer. Board investigator Paul Acuna was responsible for investigating and tabulating the authorization cards submitted by U.F.W. Acuna testified as follows at the February 28th hearing:

I conducted the showing of interest as instructed using the VGI bargaining unit total of 380 employees.[7] 30 percent of

Q. Mr. Acuna, did you discount any classifications or persons before you began your tally of authorization cards?
A. I did what was told to do here at the hearing yesterday.
Q. Would you repeat what that was?
A. That was to include those who worked six months in the calendar year '79, also less than six months in '79, to include tractor drivers, and to disclude foremen, truck drivers, and shop workers. Also, to disclude I believe all of 1980 employees as indicated by

380 is 114. That's the showing of interest that I needed, 114 employees. The UFW had the showing of interest, but subsequently checking through the authorization cards given to me by the UFW, I checked signatures on the cards with the W–4 forms given to me from VGI and there was some discrepancies in the signatures, questionable signatures. I will give an estimate of one out of every 10 or 10 percent of the total 30 percent that they gave me and one card was not legible and I couldn't read it. If you do not count the ones that are questionable, the UFW does have a showing of interest, *but if you throw out the 10 percent I feel are questionable, they do not have a showing of interest.* (emphasis added)

As the hearing officer sets forth in his response to the Board's inquiries, "this hearing officer's notes indicated that at this time the UFW had 117 valid signatures *less* the 11 forged cards ..." Thus, there existed only 106 *valid* authorization cards, seven shy of the 114 needed to constitute a thirty percent showing of interest.[8] The hearing officer specifically stated at the March 18th hearing that he found that the eleven questionable cards were forgeries:

> The Hearing Officer did find that the testimony of Mr. Acuna as to 11 forgeries was an expert's testimony and found these were forgeries and there was no evidence presented of any agency that somebody signed on behalf of somebody else or was any reason to believe that it was anything other than forgeries.

the mark across from Lomas through B-a-n-u-e-l-o-s, Banuelos. Those were discounted also. Those are 1980 employees.

8. Counsel for VGI challenged twenty names on the list of 380, alleging they were not employed by V.G.I. However, assuming all twenty of the challenged employees remained in the bargaining unit, the thirty percent showing of interest was not made:

> HEARING OFFICER: Yes. Okay, I want to ask you, Mr. Acuna, if all 21 or 22 names that were circled were included in the bargaining unit, would that make any difference in your opinion in regards to whether there was an adequate showing of interest?

As previously noted, the bargaining unit was improperly expanded to include newly hired 1980 employees subsequent to the February 28th hearing. Following the February 28th hearing, additional authorization cards were submitted. However, it is impossible to ascertain from the record whether all of the additional cards were signed by newly hired 1980 employees or whether some of the cards were from members of the original bargaining unit of 380. Indeed, counsel for V.G.I. attempted to ascertain this information at the March 18th hearing:

> HEARING OFFICER: First, let me make a statement. *I don't have that information.* I don't think that the investigators have that information available at this time anyway, but Steve, what is the relevancy of getting that information?
>
> MR. SHADLE [counsel for V.G.I.]: Well, the relevancy is for one thing part of the appeal is going to be that you are interpreting the statute to mean 1980 employees and we must know then whether or not if in fact you aren't including those people and those people are excluded whether or not that reduces the showing of interest to less than 30 percent. It's totally relevant to any appeal as to the showing of interest. *Mr. Acuna stated in his testimony that if he didn't include the people who just went to work in 1980 but didn't work for this employer last year, he indicated there would not be a showing of interest, I believe.*

> MR. ACUNA: Yes, it would make a difference if they were included. If they were not included, they would not have interest.
> HEARING OFFICER: Okay. If they were included, would the interest be there? I can't ask you numbers—
> MR. ACUNA: Yes, the interest would be there, but due to my investigation of the signatures, *it wouldn't make any difference because if I included the signatures I feel that I have some doubt about, though, it wouldn't make any difference. It wouldn't make an interest even if he included those numbers.* (emphasis added)

HEARING OFFICER: Well, I can tell you as a fact that *if you exclude 1980 employees, yes, it affects it.* The records of the investigators are available to the Board to review in regards to that, but I know of a·fact that's true, and I will state that for the record, *but the numbers I couldn't tell you.*

MR. FERNANDEZ [counsel for U.F. W.]: Excluding the 1980 employees, you are saying there would have been an insufficient showing of interest?

HEARING OFFICER: *Excluding 1980 employees that did not work in 1979, that would have affected the interest showing. What numbers, I can't tell you.* (emphasis added)

Thus, we find that the record fails to establish a thirty percent showing of inter-

est from the initial bargaining unit of 380 employees.

For the foregoing reasons, the judgment of the Superior Court is reversed. The decision of the Board is also reversed, the petition for election filed February 15, 1980 is ordered dismissed, and the results of the March 28, 1980 election are ordered stricken.[9]

EUBANK, P.J., and JACOBSON, C.J., concur.

---

**9.** Based upon our disposition of this case, we need not address the remaining issues raised by V.G.I. Additionally, we find it unnecessary to rule upon the Board's motion to strike.